UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY  DIVISION


CRAIG & LANDRETH, INC. d/b/a CRAIG )
& LANDRETH MAZDA and LARRY       )
CRAIG and JAMES H. SMITH, JR. a/k/a )
JIMMY SMITH,                      )
          Plaintiffs,             )
                                  )
     vs.                          )          4:07-cv-0134-SEB-WGH
                                  )
MAZDA MOTOR OF AMERICA, INC.      )
d/b/a MAZDA NORTH AMERICAN        )
OPERATIONS,                       )
          Defendant.              )


**ORDER GRANTING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


     This cause comes before the Court on Defendant's Motion for Summary Judgment

[Docket No. 105] filed by Mazda Motor of America, Inc. d/b/a Mazda North American

Operations ("Defendant") and brought pursuant to Federal Rule of Civil Procedure 56(c).

Craig & Landreth Mazda and its officers, Larry Craig and James Smith ("Plaintiffs"),

brought this lawsuit asserting (Counts I, III) breaches of contract; (Count II) bad faith;

(Count IV) fraud; (Count V) deceptive practices, pursuant to the Indiana Deceptive

Franchise Practice Act, I.C. § 23-2-2.7; and (Count VI), a request for punitive damages.

Pursuant to their Motion, Defendant seeks judgment as a matter of law on all counts.

Plaintiffs object to Defendant's entitlement to summary judgment.  For the reasons

detailed herein, the Motion is <u>GRANTED</u> in part and <u>DENIED</u> in part.[1]

## Factual Background

Defendant Mazda is an automobile manufacturer. Plaintiffs became a Mazda dealership in 1996. Compl. ¶ 7. Plaintiffs were, in fact, an exclusive Mazda dealership, meaning that the only new vehicles Plaintiffs sold were those manufactured by Mazda.[2] Plaintiffs' allegations stem from two disputes that arose between the parties – Defendant's allegedly discriminatory vehicle allocation practices, and Defendant's failure to allow Plaintiffs to acquire a non-party dealership, referred to as the "East End Dealership." The facts underlying each of these disputes are discussed below.

### Defendant's Allocation Practices

Plaintiffs contend that Defendant breached its duty to fairly and uniformly allocate its wholesale automobiles among its franchisees as it was obligated to do under the Dealer Agreement. The applicable provision in the Dealer Agreement provides as follows:

> Mazda agrees to use its best efforts to provide such Mazda products . . . to Dealer in such quantities and types as Dealer may require in order to fulfill Dealer's obligations for sale and servicing of Mazda Products under this Agreement. However, Dealer and Mazda acknowledge that Mazda's supply of Mazda Products can vary from time to time for many reasons and that to maintain an effective distribution system, it may be necessary for Mazda to allocate its supply of Mazda Products among Mazda Dealers.

---

[1]Plaintiffs' Exhibits to their Response brief appear to have been mislabeled, e.g. Plaintiffs' citations to Exhibit 29 appear to be to the Deposition of Alfred Vega, which is actually filed as Exhibit 28. To avoid confusion, we cite to the descriptive title of all exhibits.

[2]Plaintiffs also sold pre-owned vehicles throughout the period they were a Mazda dealership. This business is irrelevant, however, for purposes of this Motion.

2

Mazda shall endeavor to allocate Mazda Products among its dealers in a fair and equitable manner, utilizing uniform methods of allocation which take into consideration such factors as are reasonably relevant. . . .

Dealer Agreement ¶ 12B. The parties agree that during the period Plaintiffs were a Mazda dealer, Defendant employed three methods of allocating its wholesale vehicles to its dealers. First, Mazda had an allocation methodology that calculated the number of vehicles available for wholesale to dealers by using a weighted average of the dealer's Share of Nation ("SON") and Balance Month Supply ("BMS"). See Def.'s Ex. E, MNAO Allocation Methodology. The fairness of this approach is not in dispute for purposes of this lawsuit.

Second, a certain number of vehicles were taken out of the pool before the allocation methodology was run. In fact, approximately 10 percent of all Mazda products produced in a region may (at the discretion of the region) have been held back within a "regional pool" and allocated to dealers within that region. Beuck Dep. at 32-33. The parties dispute the purpose of this regional pool apart from the regular allocation methodology. Plaintiffs claim that this policy allowed Defendant to bypass its contractual obligation to uniformly allocate vehicles and, instead, allowed Defendant to "pick its favorite dealers or friends and give the friends extra products." Pls.' Resp. at 3. They offer evidence that two dealers who they claim were "favored" received considerably more wholesale vehicles via the regional pool than did Plaintiffs. Third Aff. of J. Smith ¶ 6; Second Affidavit of Ernest Manual, Jr. ¶¶ 16-17. They also point out that the existence of these pooled vehicles was not disclosed to Defendant's dealers, allowing Defendant

total discretion to assign the vehicles.  Beuck Dep. at 34-36.  Defendant argues that its practice of not disclosing the regional pool to dealers is justified and specifically provided for in the Dealership Agreement, which contains the following provision: "Mazda agrees to provide Dealer with an explanation of the method used to distribute [its] products upon written request . . . ."  Dealer Agreement ¶ 12B.

Defendant's Regional General Manager Jeff Beuck testified that the assignments from the Regional Pool were not governed by any standards or written guidelines.  Beuck Dep. at 34-36.  He also testified, however, that the purpose of the regional pool was to make additional vehicles available to new dealers or those that have completed construction on a new facility, or to re-supply dealers who have had particular success in their retail sales.  Beuck Dep. at 34-35 see also Vega Dep. at 134-135; Davis Dep. at 22.  The regional pool may also have been used to supply vehicles for auto shows or individual market promotions.  Davis Dep. at 22.

The third method used by Defendant in making its vehicles available to its dealers was called DM commitments.[3]  Like the regional pool allocations, Plaintiffs allege that this commitment process allowed Defendant to assign more vehicles to its preferred dealers than those dealers earned using the allocation methodology.  For instance, Plaintiffs offer evidence that two dealers, who they claim were "favored," received considerably more vehicles via DM commitments than did Plaintiffs.  Third Aff. of J.

---

[3]We note that the parties also refer to these commitments as "DN" commitments at times. See, e.g., Def.'s Supp. Reply at 11.

4

Smith ¶ 6; Second Affidavit of Ernest Manuel, Jr. ¶¶ 16-17.  In addition, because the overall supply of products remained the same, Plaintiffs allege that they and other dealers received fewer vehicles than they were entitled to under the allocation methodology as a result of the DM commitment process.  For instance, Plaintiffs point out that in November 2005, a total of 92 Mazda 3's were committed to six dealers, leaving only 85 Mazda 3's to be distributed to the remaining 36 dealers by applying the allocation methodology.  Pls.' Ex. 34, 11/2/05 Allocation Earnings Report at 4-5.

Defendant explains that the commitments were made pursuant to a policy and that, like the regional pool allocations, they were used primarily to supply vehicles to new dealers who had no sales history or inventory for use in the allocation methodology.  Kita Dep. at 23-25.  Defendant avers that these DM commitments were also used to distribute vehicles to dealers who upgraded their facilities or became exclusive Mazda dealers.  Id.

In sum, Plaintiffs claim that the regional pool and DM commitment methods of vehicle allocation ran afoul of Defendant's contractual obligation to "endeavor to allocate Mazda Products among its dealers in a fair and equitable manner, utilizing uniform methods of allocation . . . ."  Defendant defends these two allocation methods as based on "sound business decisions," necessary to ensure that all dealers had access to their fair share of vehicles, and were not discriminated against.  In addition, Defendant presents evidence, the credibility of which is challenged by Plaintiffs, that they claim establishes that Plaintiffs received vehicles in a fair manner and in line with other dealers in their region.  Def.'s Ex. I, Summary Wholesale Data from October 1, 2003 through November

30, 2006; Def.'s Ex. J, Craig & Landreth Mazda Wholesale v. Retail Comparison for October 2003 through November 2006; Def.'s Ex. U, 2006 Wholesale Comparison Mazda 3 Sedan v. Total.

**The East End Dealership**

Blue Grass Automotive, Inc. ("Blue Grass") originally owned and operated a Mazda dealership in Louisville, Kentucky, referred to as the "East End Dealership." Plaintiffs had considered purchasing that dealership and had multiple conversations with Defendant's representatives about that possibility. Parsons Dep. at 46-47; Stach Dep. at 43-44; Mears Dep. at 60; 95. In fact, Mazda Regional General Manager Jeff Beuck once told Plaintiffs that "if the opportunity ever arose, . . . they would be on the top of the list." Beuck Dep. at 140. During certain of these conversations, Plaintiffs were told that Defendant was unhappy with the manner in which Blue Grass was operating the East End Dealership. Second Aff. of J. Smith ¶ 7; 8/1/06 L. Craig Letter. At times, Plaintiffs were encouraged to continue to sell new Mazda vehicles exclusively in spite of opportunities to expand their new vehicle business. J. Smith Dep. at 81-87; 8/1/06 L. Craig Letter. According to Plaintiffs, this encouragement came from Defendant as a quid pro quo for the opportunity to purchase the East End Dealership should such a sale present itself. See Smith Dep. at 81. Other witnesses testified, however, that *all* dealers were encouraged to remain exclusive Mazda dealerships. Stach Dep. at 44; Mears Dep. at 63. These conversations between the parties included a meeting at the Brown Hotel in Louisville, Kentucky at which a toast was allegedly made to Plaintiffs as the "new owners" of the

East End Dealership.  May Dep. at 34-35.  Plaintiffs argue that the upshot of these conversations was the creation of an oral contract between the parties.

Although Plaintiffs never developed any type of business plan relating to the acquisition of the East End Dealership, Plaintiff Smith testified that Plaintiffs had contacted Mazda Credit and PNC Bank in an effort to ready themselves should the opportunity to purchase the East End Dealership become a reality.  Smith Dep. at 113.

Defendant agrees that these conversations occurred but contends that they never rose to the level of becoming an enforceable contract.  Def.'s Br. ¶ 18.  Defendant also disputes that Plaintiffs took any action in reliance on any such agreement.  Id. ¶ 21.

In Fall 2005, Blue Grass sold the East End Dealership to a company called either Farmer Acquisitions or Oxmoor Automotive Group, but which name both parties abbreviate as Oxmoor.  Def.'s Br. ¶ 22; Pls.' Resp. ¶22.  Four other tracts of commercial real estate and three other automobile franchises -- Hyundai, Lincoln-Mercury, and Isuzu -- were also part of the deal.  Def.'s Br. ¶ 22.  Although Oxmoor was not particularly interested in the Blue Grass Dealership, it was part of the packaged sale.  Def.'s Br. ¶ 22; Pls.' Resp. ¶22.  Plaintiffs claim that the buy-sell agreement between Oxmoor and Blue Grass occurred only because Defendant had opted not to exercise its Right of First Refusal, which Plaintiffs claim amounted to a breach of its oral promise to Plaintiffs. Pls.' Resp. ¶ 22.

On August 1, 2006, Plaintiff Larry Craig wrote Jeff Beuck a letter detailing his complaints and requesting a mediation pursuant to the Dealership agreement.  8/1/06

Larry Craig Letter. Specifically, Craig explained Plaintiffs' complaints regarding

Defendants' distribution and allocation policy, the unfair market advantage, and the

transfer of the East End Dealership. Id. On October 19, 2006, Craig sent another letter to

Beuck indicating his intent to "cease operations as a Mazda dealer." 10/19/2006 Larry

Craig Letter. This litigation ensued.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party

and draws all reasonable inferences in favor of the non-moving party. See id. at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of

Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. <u>Id.</u> at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. <u>Waldridge v. Am. Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. <u>See</u> <u>Shields Enterprises, Inc. v. First Chicago Corp.</u>, 975 F.2d 1290, 1294 (7th Cir. 1992); <u>Wolf v. City of Fitchburg</u>, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. <u>See</u> <u>Celotex</u>, 477 U.S. at 322; <u>Ziliak v. AstraZeneca LP</u>, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323.

## II.    Discussion

The Parties have conveniently organized each of their arguments to correspond with the respective Counts in Plaintiffs' Complaint. Thus, in addressing each of the parties' arguments we shall do likewise by referencing the claims with the counts in the

Complaint.

### **Count I Breach of Contract (Allocation Policy)**

In Count I, Plaintiffs allege that Defendant's allocation practices breached the Dealer Agreement between the parties. Compl. ¶¶ 19-21. Defendant argues that Plaintiffs have failed as a matter of law to establish any breach by Defendant because Defendant treated Plaintiffs entirely fairly and equitably in the manner in which it made vehicles available for sale. Def.'s Br. at 10-17. Defendant notes that the Dealership Agreement did not obligate Defendant to provide Plaintiffs with a specific number of vehicles. Rather, "[Defendant's] only obligation was to *try* to make vehicles available for wholesale in a fair and equitable manner . . . ." Def.'s Br. at 13. Even so, summaries prepared by Defendant and submitted to reflect its wholesale data establishes, according to Defendant, that Plaintiffs were treated "fairly, equitably, and in line with other dealers in the Gulf Region." Plaintiffs devote a major portion of their argument in their Response [Docket No. 116], Sur-Reply [Docket No. 123] and Supplemental Response [Docket No. 159] to disputing the accuracy of the summary data proffered by Defendant. Because, for other reasons, we find that Plaintiffs have created genuine issues of material fact with regard to Defendant's alleged breach, however, we decline to rule on the admissibility of Defendant's summary evidence proffer at this time.

Plaintiffs correctly frame the issue here as whether Defendant complied with its contractual obligation to "endeavor to allocate Mazda Products among its dealers in a fair and equitable manner, utilizing uniform methods of allocation which take into

consideration such factors as are reasonably relevant." Dealership Agreement ¶ 12B. While Defendant is correct that this provision did not require Defendant to allocate any particular number of vehicles to Plaintiffs, it is clear that a genuine issue of material fact exists with regard to whether Defendant did, in fact, fulfill its promise.[4]

Plaintiffs assert that there were no standards, policies, or restrictions governing allocations from Defendant's regional pool of vehicles. Construing the evidence in the light most favorable to Plaintiffs, this appears to be true. See, e.g., Lokhandwala Dep. at 13-14. The fact that Defendant maintained this pool of vehicles to be allocated manually without restrictions, however, does not necessarily mean that Defendant breached its contractual obligation to try to allocate its vehicles fairly. This is a question of fact to be left for the jury to decide.

The same analysis applies to Plaintiffs' assertion that the regional pool was not disclosed to dealers. Again, this appears to be true. See, e.g., Beuck Dep. at 34. The fact

---

[4]We note that much of the evidence cited by Plaintiffs does not stand for the propositions they claim and, thus, we have not considered it when determining the validity of their claim. For example, Plaintiffs cite to pages 58, 64-65 of Beuck's deposition testimony to show that Dealer Hiley, whom they allege to be a close friend of Beuck, received substantially more Mazda 3's than did Plaintiffs. In fact, the testimony reveals only that Beuck took one non-business related vacation with Hiley. Beuck Dep. at 64-65. Page 58 contains absolutely no reference to Hiley. Beuck Dep. at 58. Likewise, Plaintiffs cite to page 18 of Exhibit 29 for the proposition that an inferior dealer was able to earn more new vehicles than Plaintiffs in November 2005. But there is no page 18 within Plaintiffs' Exhibit 29 or in Exhibit 28, which this Court also reviewed given Plaintiffs' persistent pattern of mislabeling exhibits. Finally, Plaintiffs' reference to evidence showing that *they* received preferential treatment at times (as evidence of favoritism inherent in Defendant's practices) suffers from the same deficiency. There is no page 142 in either Exhibit 27 or 26 and the only mention of Plaintiffs on page 164 of Exhibit 26, the deposition of Ronald Stach, is that "we liked these guys." Stach Dep. at 164. This evidence fails to show that Plaintiffs were favored with vehicles from the discretionary pool.

that Defendant did not tell Plaintiffs about its methods of allocation does not necessarily establish a breach of Defendant's duty. In fact, the Dealership Agreement provides for such an instance where it states, "Mazda agrees to provide Dealer with an explanation of the method used to distribute [its] products upon written request . . . ." Dealership Agreement ¶12B. However, whether Defendant could keep these allocations secret consistent with its obligation to "endeavor to allocate Mazda Products among its dealers in a fair and equitable manner" cannot be decided as a matter of law.

Perhaps Plaintiffs' most convincing evidence relates to the DM commitments, which were only recently discussed in Plaintiffs' Supplemental Response. Plaintiffs show that in November 2005, a total of 92 Mazda 3's were committed to six dealers, leaving only 85 Mazda 3's to be distributed to the remaining 36 dealers through the allocation methodology. Pls.' Ex. 34, 11/2/05 Allocation Earnings Report at 4-5. Thus, Defendant committed more Mazda 3's than were included even in the allocation methodology. It is a question for the jury whether such a practice was consistent with Defendant's contractual obligations.

Likewise, in its Supplemental Response, Plaintiffs have set forth comparisons of vehicles received by themselves and other dealers, whom Plaintiffs claim were "favored" via the regional pool. Plaintiffs' consultant, Earnest H. Manuel, Jr., testified by affidavit that two other dealers received considerably more vehicles through the DM assignments or the regional pool than Plaintiffs. Second Aff. of Ernest Manuel, Jr. ¶¶ 16-17. Whether this comparison shows a breach Defendant's contractual duties is again a question for the

jury.

In response to Plaintiffs' assertions, Defendant offers what may be very convincing evidence of the fairness by which it allocated its vehicles. Defendant vehemently attacks the credibility of the Manuel Affidavit. Defendant also offers summary data, which purportedly shows that Plaintiffs were wholesaled a similar or higher percentage of certain vehicles compared to other dealers. As referenced above, the integrity of this data has been attacked by Plaintiffs. Defendant's evidence may very well convince a jury that Defendant complied with its contractual obligations, but, because we find that the evidence proffered by Plaintiffs has created genuine issues of material fact, we are precluded from deciding this claim as a matter of law.

### Count II Bad Faith

In Count II, Plaintiffs allege that Defendant's failure to allocate new vehicles to Plaintiffs violates "the duty of good faith and fair dealing in violation of both the common law and Indiana Code § 26-1-1-203."[5]

In Indiana, a common law duty of good faith is rarely imposed on contracts where the terms of the contract are clear and unambiguous. See Lake County Trust Co. v. Wine, 704 N.E.2d 1035, 1039-40 (Ind. Ct. App. 1998).

Plaintiffs have conceded that the terms of the Dealership Agreement were clear

---

[5]Plaintiffs have apparently withdrawn their claim to the extent that it alleges a violation of I.C. 26-1-1-203, though they have not amended their Complaint. See Pls.' Resp. at 28 n. 14. Accordingly, we also GRANT summary judgment in Defendant's favor to the extent that Count II includes a violation of that statute.

and unambiguous.  Pls.' Resp. at 27.  Nonetheless, they assert (with absolutely no support) that the Dealership Agreement imposed a duty of good faith and fair dealing based on the terms of that agreement.  Id. at 27-28.  We agree with Defendant that there is no difference between this assertion and that of Count I -- that Defendant breached the terms of the agreement.  Thus, we GRANT Defendant's Motion for Summary Judgment with regard to Count II.

**Count III Breach of Contract (East End Dealership)**

In Count III, Plaintiffs allege that Defendant's failure to award Plaintiffs the East End Dealership constituted a breach of an agreement between the parties.  Compl. ¶¶ 25-27.  In return for Defendant's alleged commitment, Plaintiffs allege that they forewent "opportunities to become authorized dealers of other manufacturer's new automobiles, and remain[ed] exclusively a Mazda dealership."  Compl. ¶ 14-15.  Plaintiffs admit that no written agreement to purchase the dealership existed but maintain that numerous representatives of Defendant had told Plaintiffs that they would be awarded the dealership when the opportunity arose.  Defendant argues that the lack of a writing makes any alleged contract void, pursuant to the Uniform Commercial Code's statute of frauds, I.C. § 26-1-2-201(1).  Furthermore, they argue that Plaintiff has not established a genuine issue of material fact regarding the creation of an oral contract between the parties.  For the reasons discussed below, we agree with Defendant.

In Mays v. Trump Indiana, Inc., the Seventh Circuit (applying Indiana law) explained that "[u]nder Indiana law, and in fact the law of every jurisdiction, a meeting of

14

the minds on all essential terms must exist in order to form a binding contract. . . . And an agreement to agree does not a binding contract make." 255 F.3d 351, 357-58 (7th Cir. 2001) (internal citations omitted). The Court went on to explain that "[w]ithout an express intent [to be bound], the focus is on whether the contract is too indefinite to enforce. Thus, the existence or nonexistence of a contract turns on whether material terms are missing." Id. In Mays, despite various writings evidencing negotiations, proposals, and plans, the Court found that "material terms [were] absent in spades" and, thus, no contract existed as a matter of law. Id.

In our case, the lack of definiteness regarding material terms is far more severe.

First, Plaintiffs offer evidence that it was "common knowledge" at Defendant's corporate offices that Defendant wanted Plaintiff to take over the East End Dealership; that Defendant asked Plaintiffs if they would be interested in obtaining a dealership; that Plaintiffs had been told that they would be "on the top of the list," if an opportunity for a buy-sell agreement arose; that Plaintiffs' dealership had been a great success; and that Defendant had led Plaintiffs to believe that it lacked confidence in or was initiating termination proceedings against Blue Grass (the (then) owner of the East End Dealership). Pls. Resp. at 33. Even if true, none of this evidence is relevant to the inquiry of whether a contract was established. We, therefore, disregard it for purposes of assessing the legal viability of Count III.

Second, although numerous witnesses acknowledge that discussions occurred about the possibility of Plaintiffs eventually acquiring the East End Dealership, no

witness claims that there was a promise that the acquisition would necessarily occur. Even the evidence cited by Plaintiffs supports this point. See, e.g., Buecke Dep. at 155 ("I – I don't remember. I don't know if we got to the point where we had a solid plan in place to be able to even discuss that. We were talking possibilities."). Furthermore, the deposition testimony proffered by Defendant establishing that no concrete, oral promise was made has gone unanswered by Plaintiffs. Beuck Dep. at 140-41 ("Q: Did you ever specifically make any commitments yourself to Craig & Landreth about an east point in any respect? A: No, sir, other than if the opportunity ever arose, that they would be on the top of the list because of what a great job they did for us."); Ewing Dep at 20; Harrell Dep. at 47, 50, 79; Lokhandwala Dep. at 38-40; May Dep. at 35 ("I don't remember a consensus was made at the meeting. There was a lot of discussion because it was a large – a large point. You know, I mean, we had a lot of opportunity there; but I don't recall that there was a definitive who should be the dealer there."); Mears Dep. at 95 ("I was not privy to any specific conversation where they were promised the east end dealership or Blue Grass but certainly was involved in conversations where we would certainly like to facilitate – try to help facilitate and see that happen."); Parsons Dep. at 46-47; Stach Dep. at 45; Yves Dep. at 127; Vega Dep at 31-32.

Even Plaintiffs do not attest to any agreement resembling an enforceable contract. Plaintiff Smith testified that Beuck told him, "We're going to put you and Larry in the east point of Louisville as the Mazda dealer. . . . I need you in the east end of Louisville. I have an underperforming dealer there." Smith Dep. at 114-115. In the very next breath,

however, Smith admitted that Beuck did not "get specific" with regard to the actual termination of Blue Grass's ownership of that dealership.  Id.  Plaintiff James Smith's Second Affidavit (Pls.' Ex. 4) stated only: "Mazda representative[s] told me, on multiple occasions, that they wanted Craig and Landreth to take over the East End Dealership because Blue Grass was defrauding records."  Likewise, Larry Craig's letter (Pls.' Ex. 14) states merely that he had been told since 1999 that Mazda executives "wanted" Craig & Landreth to be the new East End dealer.  Even if true, all of these statements would have been unenforceable statements of intent, not an enforceable promise.  Corbin on Contracts § 1.15 ("A person may express an intention to do something in the future without promising to do it.")  These statements are entirely consistent with the fact that there *had* been discussions between the parties regarding their mutual interest in Plaintiffs eventually acquiring the East End Dealership, once it became available.  What neither statement establishes, however, is that an enforceable agreement was made that that would necessarily happen.

Third,  Plaintiffs have only their own testimony as support for their claim that the encouragement they received to remain an exclusive Mazda dealership was the quid pro quo for Plaintiffs' eventual acquisition of the East End Dealership.  No less than the evidence cited in Plaintiffs' Opposition Brief makes clear this point.  See, e.g., Stach Dep. at 44 ("We encouraged all of our dealers who were exclusive to remain exclusive, and we encouraged all of our dealers who were dual to become exclusive dealers."); Mears Dep. at 63 (Q: "Do you recall anyone within the region having any conversations with Jimmy

or Larry encouraging them to remain exclusive Mazda dealers for [the purpose of acquiring the East End Dealership]? A: Not specific for that purpose, but I do recall – this would have been early 2000 – that we would want them to remain exclusive. We thought that that was the best representation for us in Clarksville, Indiana and that they were doing a good job for us at this point, being exclusive.").

Plaintiffs attempt to make much of the meeting that occurred at the Brown Hotel in Louisville and a toast made referencing Plaintiffs "as the new dealers in the East End of Louisville Kentucky." Pls.' Resp. at 34. Even viewing this evidence in favor of Plaintiffs, it falls short of establishing an enforceable contract. Diane May conceded that that toast had been given and that the purpose behind the parties' discussions had been to determine Plaintiffs' interest in the East End Dealership. May Dep. at 34-35. But, without more, nothing May testified to evidences the creation of a contract.[6]

Finally, that Beuck told Al Vega a "mistake" had been made with regard to the sale of the East End Dealership and that he was going to "get back with them about it" hardly shows an enforceable agreement. Moreover, Ronald Stach's statement that Plaintiffs "were probably the best candidate for the east end of Louisville if they acquired it" does not establish that Plaintiffs ever did, in fact, contract for the right to acquire it. Stach Dep. at 88. Likewise, Stach's email expressing his belief that Plaintiffs *should* be a part of Defendant's "succession plan" does not prove that an agreement was ever made to

---

[6]Plaintiffs also cite Exhibit 23 at 96 for the proposition that a toast was made to Plaintiffs. However, we have again found no page 96 in either Exhibit 23 or Exhibit 22.

the effect that Plaintiffs *would* be a part of that plan.  See 3/6/06 Stach Email.

In sum, besides Plaintiffs' assertion, there is a complete lack of evidence that a promise was made, let alone that material terms were agreed upon.  Thus, construing all the evidence in favor of Plaintiff, we still can find no evidence by which a reasonable jury could find an enforceable contract.  Because Plaintiffs' breach of contract action with respect to the acquisition of the East End Dealership fails as a matter of law, we <u>GRANT</u> Defendant's Motion for Summary Judgment with respect to Count III.[7]

### **Count IV Fraud**

In Count IV, Plaintiffs allege that Defendant made material misrepresentations of fact that the East End Dealership would be replaced, and that Plaintiffs would be awarded that dealership if they remained a "single point," i.e., an exclusive Mazda dealership.

As an initial matter, we find that Indiana law applies to Plaintiffs' claim. Defendant correctly points out that the allegations underlying Count IV in Plaintiffs' Complaint include events occurring far after the incident at the Brown Hotel in Kentucky. The last incident according to Plaintiffs with regard to this Count (besides the alleged apologies that would have occurred after any alleged fraud had been committed) took place in Clarksville, Indiana.  Compl. ¶ 29(g).  Thus, under the rule of *lex loci delicti*, Indiana law applies.  <u>See</u> <u>Allen v. Great Am. Reserve Ins. Co.</u>, 766 N.E.2d 1157, 1164-65 (Ind. 2002) (a tort is deemed "to have been committed  in the state where the last event

---

[7]  Plaintiffs' Motion for Summary Judgment, included in its Response brief, [Docket No. 116] with regard to the Statute of Frauds issue is hereby <u>DENIED</u> as moot.

necessary to make an actor liable for the alleged wrong takes place.")(quoting Hubbard Mfg. Co., Inc. v. Greeson, 515 N.E.2d 1071, 1073 (Ind. 1987)).

The elements of fraud under Indiana law are: (1) a false statement of past or existing material fact; (2) made with knowledge it was false or made recklessly without knowledge of its truth or falsity; (3) made for the purpose of inducing the other party to act upon it; (4) and upon which the other party did justifiably rely and act; and (5) proximately resulting in injury to the other party. Rice v. Strunk, 670 N.E.2d 1280, 1289 (Ind. 1996).

Defendant correctly points out that under Indiana law, "fraud may not be based on representations regarding future conduct, or on broken promises, unfulfilled predictions, or statements of existing intent which are not executed." Comfax Corp. v. North Am. Van Lines, 587 N.E.2d 118, 125 (Ind. Ct. App. 1992). Here, all of Defendant's alleged misrepresentations were based on broken promises that Plaintiffs would be awarded the East End Dealership. Thus, Plaintiffs have failed to allege, let alone create a genuine issue of material fact with regard to, their common law fraud claim.[8]

### Count V Deceptive Practices

Count V of Plaintiffs' Complaint alleges that Defendant "violated the Indiana Deceptive Franchise Practice Act ("IDFPA"), set forth in I.C. 23-2-2.7, by refusing or failing to deliver reasonable quantities of new cars which Mazda had agreed to supply to

---

[8]A "[c]onstructive fraud may be found where one party takes unconscionable advantage of his dominant position in a confidential or fiduciary relationship." Plaintiffs have not adequately alleged or created a genuine issue of material fact that such a relationship existed.

plaintiff . . . ."  Compl. ¶ 35.  The applicable portion of the IDFPA prohibits a franchisor

from "[d]iscriminating unfairly among its franchisees or unreasonably failing or refusing

to comply with any terms of a franchise agreement."  I.C. § 23-2-2.7-2(5).

In its Motion for Summary Judgment, Defendant argues that Plaintiffs' claim fails

as a matter of law because Plaintiffs filed suit after the expiration of the IDFPA's statute

of limitations.  An action pursuant to the IDFPA may not be brought "more than two (2)

years after the violation."  I.C. § 23-2-2.7-7.  Defendant argues that the statute of

limitations is occurrence-based and that it begins to run whenever Plaintiff *believed* that a

violation had occurred.  Def.'s Reply at 22-25.  Thus, Defendant asserts that the statute

began to run as early as 2000 but no later than January 2005, when Plaintiffs allege they

were not allowed to buy new cars from Defendant, and the date from which Plaintiffs'

expert calculates damages.  Def.'s Br. at 42 (citing Compl. ¶ 10; Def.'s Ex. AB, Michael

L. Brookshire and George A. Barrett, *Preliminary Analysis of Lost Profits*, at i).

Plaintiffs counter that Defendant's actions were a continuous violation of the IDFPA and

that the continuing wrong doctrine therefore applies.  Furthermore, they assert that they

did not know the full extent of Defendant's alleged violation until this litigation

transpired.  Thus, Plaintiffs argue that the statute of limitations should not be deemed to

have begun to run until 2006, when Plaintiffs terminated their dealership relationship with

Defendant.  Pls.' Resp. at 42-44.

Under Indiana law, the doctrine of continuing wrong applies "[w]hen an entire

course of conduct combines to produce an injury . . . ."  Frady v. Hedgcock, 497 N.E.2d

620, 622 (Ind. Ct. App. 1986). This doctrine delays the running of the statute of limitations until the wrongful act ceases, allowing the plaintiff to file suit within normal statutory confines. Ayers v. Marathon Ashland Petroleum, LLC, 2005 WL 2428205 at *3 (S.D. Ind. 2005) (J. Young) (citing Boggs v. Tri-State Radiology, Inc., 730 N.E.2d 692, 699 (Ind. 2000)). The statute of limitations will continue to run, however, "if the Plaintiff learns of facts that should lead to the discovery of a cause of action, even in the event that the relationship . . . continues afterward." Id. (citing Parks v. Madison County, 783 N.E.2d 711, 719 (Ind. Ct. App. 2003)).

Plaintiffs' lawsuit was filed on October 5, 2007. Thus, for Defendant to succeed on its statute of limitations argument, it must establish that Plaintiffs knew of the possibility of Defendant's discriminatory practices prior to October 5, 2005. We find that Defendant has successfully done so.

Even if Plaintiffs did not know all of the specifics regarding the allocation practice they now challenge, Defendant has established that Plaintiffs complained about Defendant's allocation practices as early as 2000 and that those complaints continued over the course of the next several years. Plaintiff Smith testified that he complained about Defendant's inventory allocation practices as early as 2000. Smith Dep. at 57-58. Furthermore, Plaintiffs' Complaint alleges that the complained of practices by Defendant began "in or around January 2005." Compl. ¶ 10. Plaintiffs' Response does not offer conflicting evidence on this point. Rather, they argue that Defendant's reassurances that the allocation was not discriminatory justifies the tolling of the statute. But Defendant

*still* insists that its allocation practices were not discriminatory, which (evidenced by this lawsuit) does not prevent Plaintiffs from pursuing their claim. Because we find that Plaintiffs did not file their claim within two years of the time they first came to believe that Defendant's allocation practices were discriminatory, Plaintiffs' claim is barred by the statute of limitations. Therefore, summary judgment is warranted.

### Count VI Punitive Damages

Plaintiffs' Count VI alleges that Plaintiffs are entitled to punitive damages as a result of Defendant's actions which constituted the torts of bad faith and fraud. Compl. ¶¶ 39-40. Because we have found that Plaintiffs' fraud and bad faith claims fail as a matter of law, so too must their claim for punitive damages. See Allstate Ins. Co. v. Axsom, 696 N.E.2d 482, 485 (Ind. Ct. App. 1998). Summary judgment will enter accordingly.

### Conclusion

For the reasons stated herein, we find that Plaintiffs have succeeded on creating a genuine issue of material fact only with regard to Count I of their Complaint. Thus, Defendant's Motion for Summary Judgment is GRANTED with regard to Counts II, III, IV, V, and VI; and DENIED with regard to Count I.

IT IS SO ORDERED.

Date:_____10/07/2010_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Fred E. Fischer III
FISCHER & KELLY
fischerandkelly@insightbb.com

William Jay Hunter
STOLL KEENON OGDEN PLLC
william.hunter@skofirm.com

Brad S. Keeton
STOLL KEENON OGDEN PLLC
brad.keeton@skofirm.com

Joseph Michael Kelly
FISCHER & KELLY
fischerandkelly@insightbb.com

Crystal Gates Rowe
KIGHTLINGER & GRAY, LLP
crowe@k-glaw.com

Van T. Willis
KIGHTLINGER & GRAY, LLP
vwillis@k-glaw.com